**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| ROBERT LEE ROBERTSON, | |
| Plaintiff, | Civil No. 16-3331 (RMB) |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

This matter comes before the Court on an appeal from a final administrative decision by the Commissioner of Social Security which denied benefits to Plaintiff Robert Lee Robertson ("Plaintiff"). (Administrative Record ("AR") 7-9). On June 6, 2017, this Court conducted oral argument. For the reasons set forth below, the Commissioner's decision is affirmed.

## I.   PROCEDURAL BACKGROUND.

On October 19, 2011, Plaintiff filed an application for Social Security disability benefits under Title II and Title XVI of the Social Security Act. (AR 189-97). Plaintiff alleged a disability onset date of August 20, 2010 with underlying conditions of anxiety, heart problems, and Hepatitis C. (Id. at 110). Pursuant to the determination of the Administrative Law Judge ("ALJ") currently being reviewed by this Court, Plaintiff meets the insured status requirements of the Social Security Act

through March 31, 2016.  (<u>Id.</u> at 12).  The claim was initially denied on June 28, 2012.  (<u>Id.</u> at 116).  The claim was denied upon reconsideration on December 31, 2012.  (<u>Id.</u> at 125).  A hearing was held before an ALJ on April 22, 2014.  (<u>Id.</u> at 28). On August 14, 2014, the ALJ entered an unfavorable decision. (<u>Id.</u> at 7-9).  A request for review was denied by the Appeals Council on May 12, 2016.  (<u>Id.</u> at 1-3).

## II.  **FACTUAL BACKGROUND**

Plaintiff was born on April 9, 1962, making him 55 years old on the date of argument of this appeal.  On the alleged onset date, Plaintiff was 48 years old, but he has since aged into the "closely approaching advanced age" category as of April 8, 2012. (AR 18).

### A. **Treatment History**

#### i. **Coronary Artery Disease**

As reflected in treatment records of Dr. Edward Wrobleski in a letter to Plaintiff's GP, Dr. Stephen J. Giamporcaro, in March of 2010, Plaintiff suffered an inferior wall myocardial infarction.  (AR 554).  "He was urgently taken to the cardiac catheterization laboratory where thrombectomy was performed on the right coronary artery.  A Xience drug-eluting stent was inserted."  (<u>Id.</u>)  Since that time, Dr. Wrobleski reports in his treatment notes, Plaintiff had been asymptomatic and had denied chest pain, shortness of breath, and dyspnea.  (<u>Id.</u>)  It was

remarked that Plaintiff had a good activity level and had returned to working full time.  (Id.)

On December 1, 2010, Plaintiff was assessed for chest pain and stress imaging was generated.  (Id. at 497).  The testing indicated an impression that: (1) there was no evidence of stress-induced myocardial ischemia; (2) there was normal wall motion; and (3) the left ventricular ejection fraction was 60%. (Id.)  On October 27, 2011, Plaintiff again was evaluated for chest pain, and the conclusion of the echocardiographic study was "normal."  (Id. at 485).  Plaintiff had no reversible ischemic defect.  (Id. at 484).  A stress test indicated that there were no pharmacologically induced symptoms of chest pain and no stress-induced arrhythmias.  (Id. at 486).  In subsequent treatment in September 2012, Plaintiff reported that he was not suffering from chest pain, shortness of breath, or abdominal pain.[1]  (Id. at 379).

### ii. __Back Pain and Evaluations by Dr. Giamporcaro__

During the relevant period, Plaintiff has also sought treatment for back pain.  The records, however, are inconsistent on the degree of Plaintiff's back problem.  In July, October, and November 2011 and May 2012, Plaintiff had a normal

_____

[1] In that medical report, it was also noted that Plaintiff "continues to do cocaine. . . .  [H]e is also on methadone program[.]"  (AR 379).

musculoskeletal or back examination, (id. at 406, 409, 412, 396),
although it was noted that he suffered from "back spasm" in some
reports. (Id. at 410, 412). At other times, for instance in
June, July, August, and September 2012, Plaintiff's record
reflects diagnoses of "backache" or generalized complaints of
back pain. (Id. at 379, 382, 384, 387, 390).[2] The records also
indicate that Plaintiff was working full time. (See, e.g., id.
at 383).

In April 2012, an x-ray examination of Plaintiff's spine
revealed "a normal appearance to the vertebral bodies. The disc
spaces [were] well preserved. There [was] no evidence of
fracture, bone destruction or other abnormalities." (Id. at
467). The overall impression was that Plaintiff had a normal
lumbar spine. (Id.)

In subsequently treating Plaintiff, Dr. Giamporcaro
indicated that Plaintiff was totally disabled and attributed it –
at least in part – to Plaintiff's back, diagnosing Plaintiff with
coronary artery disease, diabetes mellitus, and a herniated
lumbar disc. (Id. at 556-57). He remarked that Plaintiff had
been disabled from February 20, 2013 through February 20, 2014.
(Id.) In April 2014, Dr. Giamporcaro noted that Plaintiff had
diagnoses of coronary artery disease, herniated disc, and

---

[2] Plaintiff's medical records contain references to back pain as
far back as 2010. (AR 423).

depression.  (Id. at 856).  He remarked that as a result of
Plaintiff's symptoms, he was severely limited and assessed him
with significant limitations, including that he would be absent
from work more than three times monthly and could not deal with
work related stress.  (Id. at 856-61).

An MRI of Plaintiff's lumbar spine in February 2013 revealed
diffuse degenerative disc disease most pronounced at L5-SI with
broad-based desiccated disc bulge and a superimposed left
paracentral disc protrusion effacing the left lateral recess
causing central canal and neural foraminal narrowing, and less
severe degenerative disc narrowing and facet joint disease at L3-
L4 and L4-L5.  (Id. at 580).

### iii. Bipolar Disorder

Although some medical records from 2011 and 2012 seem to
indicate that Plaintiff had a "normal" mental status, (id. at
393, 399, 404, 412), in February 2013, Plaintiff began treatment
at Crossroads for mental health issues.  A treatment note from
Crossroads notes that he was referred there from a recovery
program "due to an increase in depression, anxiety, feelings of
hopelessness, [history] of trauma – seeing friend shot.
[History] of criminal activity.  Desired to have mood stabilized,
[decrease] any feelings of depression[.]"  (Id. at 829).  At
Crossroads, Plaintiff was treated by Anne Albiez, APN.  (Id. at
815).  In associated records, it was noted that Plaintiff

suffered from bipolar II disorder and opiate abuse. (Id. at 817). In Plaintiff's intake notice dated July 3, 2013, it was noted that Plaintiff was "[v]ery depressed with difficulty sleeping and isolation. Feelings of hopelessness and anxiety." (Id. at 822). Similarly, in an assessment of Plaintiff's risk factors, it was noted that Plaintiff suffered risk factors of suicidal ideation, substance use, anxiety, physical complaint/medical issues, and insomnia. (Id. at 825). However, that same evaluation noted that Plaintiff's appearance and behavior were appropriate, he was cooperative and oriented with no thought disorder and goal directed and logical thought processes. (Id.). Plaintiff also was noted to be of average intellect, normal concentration, and fair insight/judgment. Plaintiff had immediate, recent, and remote memory intact. (Id.) His Global Assessment of Function ("GAF") score was noted to be a 45.[3] (Id.)

---

[3] "GAF scores are used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults. The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest. A GAF score of 41-50 indicates an individual has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning." Rios v. Comm'r of Soc. Sec., 444 F. App'x 532, 534 (3d Cir. 2011) (internal citations and quotation marks omitted). See infra for discussion of GAF scores in the context of appeals from the denial of Social Security benefits.

On December 5, 2013, Ms. Albiez filled out a mental impairment questionnaire which assessed Plaintiff's residual functioning ability.  That evaluation determined Plaintiff's GAF score was 55, with a highest GAF of 60 in the past year.  (Id. at 850).  At that time, she observed that Plaintiff had a stable mood with medication and exhibited no oddities of thought, perception, speech, or behavior.  Plaintiff was not socially withdrawn, was without delusions or hallucinations, and was without difficulty concentrating.   (Id. at 850-51).  At that time it was noted that Plaintiff's prognosis was fair and most of Plaintiff's psychotic symptoms were related to drug use.  (Id. at 852-53).  It was also noted that Plaintiff would be absent from a job more than three times a month with his current impairments. (Id. at 853).

An April 7, 2014 evaluation by Ms. Albiez determined that Plaintiff would be markedly limited in his ability to remember locations and work-like procedures, the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to work in coordination with or proximity to others without being unduly distracted by them, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform

at a consistent pace without an unreasonable number and length of
rest periods.  (Id. at 846-849).

### iv.  Consultative Examinations and State Agency Assessments

Plaintiff has undergone a number of consultative
examinations.  In an April 16, 2012 consultative examination by
Dr. P. Lawrence Seifer, Plaintiff complained of severe
depression, anxiety, and low energy.  At the time, Plaintiff was
homeless.  (Id. at 340).  With regard to the activities of daily
living, Plaintiff reported to Dr. Seifer that he had trouble
shopping, using public transportation, and interacting with
people.  (Id. at 341).  Plaintiff was also observed to have a
normal gait and posture.  His dress and hygiene appeared good.
(Id.)  It was also reported that Plaintiff could do a little
housework, follow simple instructions, and function
independently.  (Id.)  Plaintiff was observed to have
"moderate/severe" limitations due to a combination of physical
and mental states, including major depressive disorder with
psychotic features and panic disorder without agoraphobia.  (Id.
at 342).

In June 2012, Dr. C. Ivan Gordan evaluated Plaintiff.  (Id.
at 344).  At that time, Plaintiff's chief complaint was
depression dating back to 2004, along with Hepatitis C,
gastroesophageal reflux disease ("GERD"), and hypertension.
(Id.)  Plaintiff was not working at the time.  (Id. at 345).  A

physical examination showed full range of motion in all joints, with an intact muscle system.  (Id.)  Dr. Gordon's impressions were that Plaintiff suffered from reactive depression, not currently stabilized; postmyocardial infarction; GERD (controlled with medication); hypertension (controlled with medication); and borderline diabetes.  (Id.)

On June 26, 2012, Dr. Morris Feman completed an assessment of Plaintiff's residual functional capacity ("RFC") and determined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 69-70).  Dr. Feman determined Plaintiff could occasionally lift/carry 20 pounds, could frequently lift or carry 10 pounds, could stand or walk for about 6 hours in an 8-hour workday, could sit for a total of six hours in an 8-hour workday, and could do an unlimited amount of pushing, and/or pulling.  (Id. at 70).  On December 12, 2013, Dr. Nancy Simpkins agreed on reconsideration.  (Id. at 100).

Plaintiff's mental RFC was also assessed by state agency professionals.  On June 7, 2012, Dr. Amy Brams reviewed Plaintiff's medical records and completed a case analysis.  Dr. Brams indicated that Plaintiff had mild restriction of daily living activities, moderate difficulty maintaining social functioning, moderate difficulties maintaining concentration, and no repeated episodes of decompensation.  (Id. at 68).  In

completing a mental RFC assessment for Plaintiff, Dr. Brams concluded that Plaintiff was not significantly limited in his ability to carry out very short and simple instructions, his ability to sustain an ordinary routine without special supervision, and his ability to work in coordination with or in proximity to others without being distracted by them. (Id. at 71). Plaintiff was moderately limited in his abilities to: maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, make simple work-related decisions, and complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Id.)

## B. **Testimony**

### i. **Plaintiff's Testimony**

Plaintiff testified in his hearing before the ALJ. (Id. at 28). In detailing his work history, Plaintiff testified that he previously worked as a Bellman/Valet from 1999 through 2010. (Id. at 30). During that same timeframe, Plaintiff also worked in medical transport and worked as a cashier. (Id. at 30-31). Plaintiff last worked in 2011. (Id. at 32). At the hearing, Plaintiff testified that he did not think he would be able to

return to his previous work because of the lifting required and the fact that his back "locks up." (Id. at 45).

As far as Plaintiff's medical conditions, he first testified about problems with his back. (Id. at 33). He was using a cane during the hearing, which Plaintiff testified was prescribed by a doctor. (Id.) Plaintiff testified that he has "messed discs in [his] back. I have a lot of arthritis. I get real, real bad muscle spasms and my back locks up on me." (Id.) Plaintiff testified that Dr. Giamporcaro had been been treating him for his back and treating him more generally for 25 years. (Id. at 34). Plaintiff testified that Dr. Giamporcaro had been prescribing "muscle relaxers" to Plaintiff and sending him to specialists, although the specialists had done "[n]othing, really." (Id.)

Second, Plaintiff testified about his Hepatitis C treatment. Plaintiff indicated that his Hepatitis C is "non-detectable," but had recently "spiked up a little bit." (Id. at 36). As a result of the condition, Plaintiff testified that he suffers from fatigue. (Id.)

Third, Plaintiff testified about heart problems from which he suffers. Plaintiff testified that his "artery was 95% clogged" and he received a stent in 2000. (Id.) Since then, Plaintiff testified that he has received medication for his heart problems, including chest pain, but that apart from medication, no other procedures have been done. (Id. at 37).

Fourth, Plaintiff testified about his psychological symptoms. (Id.) Plaintiff testified that he was currently seeing a psychologist due to anxiety and depression issues. (Id.) Plaintiff indicated he was having trouble sitting in the room in which he was testifying because he felt as though he was "being closed in." (Id. at 38).

Fifth, Plaintiff testified that he had trouble with substance abuse. (Id. at 38). Specifically, he testified at his hearing that he had been clean for 14 months prior to the hearing and did not take pain medication for his back for that reason. (Id. at 39).

Sixth, Plaintiff testified about his everyday activities. (Id. at 40). Plaintiff was living alone at the time of the hearing, but his sister would visit to help sometimes with the cooking, cleaning laundry, and shopping. (Id. at 40). Plaintiff also testified that he is able to spend time with his grandchildren. (Id. at 41). He has trouble going to the supermarket because of the requirements of standing in line and lifting. (Id. at 46). However, at another point in his testimony, Plaintiff also testified that he could lift a gallon of milk "a couple times an hour." (Id. at 54). Occasionally, Plaintiff will host his family for dinner and he might cook them dinner (or his sister might). (Id.) Plaintiff testified that he is largely unable to drive a vehicle due to his back pain. (Id.

at 41-42).  Plaintiff testified that he typically does little to entertain himself and he has "totally got a boring life."  (Id. at 43).  Plaintiff testified that while he used to like to run, exercise, fish, bicycle, and play sports, he no longer does those things.  (Id. at 53).  He has some trouble managing his own business affairs, but reported that he has not had trouble getting along with coworkers in the past.  (Id. at 46).  Plaintiff also testified that he experiences shortness of breath while climbing stairs.  (Id. at 52).

Finally, Plaintiff also testified about his psychological treatment.  Plaintiff explained that he attends a treatment program everyday from 9:00 to 4:00.  (Id. at 50).  At that program, Plaintiff attends many classes, including classes covering "how to get into life, how to interact with people." (Id.)  Plaintiff additionally testified that although he used to have up to ten panic attacks a month, with medication, that number is four or five times per month.  (Id.)  Plaintiff testified that his chest pain appears to be linked with his anxiety.  (Id. at 51).

### ii.  **Vocational Expert Testimony**

The ALJ also took testimony from a Vocational Expert ("VE"). The VE testified that if Plaintiff were limited to light work but only occasional postural activities and could only occasionally

focus and concentrate, he would be unable to do his past work. (Id. at 58).

    After the hearing, the ALJ sent interrogatories to the VE for additional information.  The ALJ asked the VE to assume two hypothetical individuals each with Plaintiff's age and background.  The first individual would possess the RFC to perform light work, but limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling, limited to simple, routine tasks and simple work decision with frequent contact with coworkers and supervisors and occasional contact with the public, without production quotas or a production rate pace.  The second individual would be limited to light work limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling, limited to simple routine tasks and simple work decisions, with frequent contact with co-workers, supervisors and the public.  (Id. at 313).  The VE determined that this individual could perform jobs in the national economy, including photocopy machine operator, deliverer, and cafeteria attendant.  (Id. at 314).  Asked whether this same person would be able to work jobs in the national economy if he was limited to occasional concentration and attention or had to miss three or more days per month, the VE answered no.  (Id. at 326).

## C. **ALJ Decision**

At Step One of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 20, 2010, the alleged onset date.  (Id. at 12).

At Step Two, the ALJ determined that Plaintiff had the severe impairments of: disorder of the lumbar spine, coronary artery disease, obesity, and bipolar disorder.  (Id.)  The ALJ determined that the shoulder injury Plaintiff testified to at the hearing and Hepatitis C both did not meet the criteria for being a severe impairment.  (Id.)

At Step Three, the ALJ determined that Plaintiff did not have an impairment or a combination of impairments that meets or medically exceeds the severity of a listed impairment.  (Id. at 13).

The ALJ then formulated an RFC for Plaintiff: the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), characterized by an ability to sit, stand, and walk up to six hours in an eight-hour day, and lift/carry up to 20 pounds; limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling; limited to simple routine tasks and simple work decisions; with frequent contact with co-workers and supervisors and occasional contact with the public; without production quotas or a production rate pace.  (Id. at 13-14).

15

Having formulated an RFC, at Step Four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (Id. at 18).

Finally, having considered the Plaintiff's relevant characteristics and RFC, as well as the VE's testimony and interrogatory responses, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Id. at 18-19). Accordingly, the ALJ determined that Plaintiff has not been under a disability since August 20, 2010, and his claim was therefore denied. (Id. at 19).

**III. LEGAL STANDARD**

When reviewing a final decision of an ALJ with regard to disability benefits, a court must uphold the ALJ's factual decisions if they are supported by "substantial evidence." Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000); 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Cons. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

In addition to the "substantial evidence" inquiry, a court must also determine whether the ALJ applied the correct legal

standards.  See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d

Cir. 1983); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

The Court's review of legal issues is plenary.  Sykes, 228 F.3d

at 262 (citing Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429,

431 (3d Cir. 1999)).

## "Disability" Defined

The Social Security Act defines "disability" as the

inability "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not

less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The Act

further states,

> [A]n individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether
> he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential

analysis for evaluating a claimant's disability, as outlined in

20 C.F.R. § 404.1520(a)(4)(i-v).  In Plummer, the Third Circuit

17

described the Commissioner's inquiry at each step of this

analysis:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 1520(a).  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimant fails to show that [his] impairments are "severe," [he] is ineligible for disability benefits.

> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d).  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

> Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform [his] past relevant work. 20 C.F.R. § 404.1520(d).  The claimant bears the burden of demonstrating an inability to return to [his] past relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).  If the claimant is unable to resume [his] former occupation, the evaluation moves to the final step.

> At this [fifth] stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his] medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether [he] is capable of performing work and is not disabled.  See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at

this fifth step.  See Podedworny v. Harris, 745 F.2d
210, 218 (3d Cir. 1984).

186 F.3d at 428.

## IV.  ANALYSIS

Plaintiff has two primary contentions on appeal.  The first
is that the ALJ's weighing of medical evidence was erroneous.
(Pl.'s Br. 16-26).  The second contention is that the Step Five
analysis by the ALJ was not supported by substantial evidence.
(Id. at 26-31).

### A. RFC Analysis

As noted above, the ALJ determined that Plaintiff had the
RFC to perform light work as defined in 20 CFR 404.1567(b) and
416.967(b), characterized by an ability to sit, stand, and walk
up to six hours in an eight-hour day, and lift/carry up to 20
pounds; limited to occasional climbing, balancing, stooping,
kneeling, crouching, and crawling; limited to simple routine
tasks and simple work decisions; with frequent contact with co-
workers and supervisors and occasional contact with the public;
without production quotas or a production rate pace.  (AR 13-14).

A claimant's RFC is the most that he can do despite his
limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)91).  In
assessing that RFC, an administrative decision should be
"accompanied by a clear and satisfactory explication of the basis
on which it rests."  Williams v. Apfel, 98 F. Supp. 2d 625, 631
(E.D. Pa. 2000) (quoting Cotter v. Harris, 642 F.2d 700, 704-05)

(3d Cir. 1981)).  Plaintiff contends that the ALJ improperly weighed the medical evidence in arriving at Plaintiff's RFC. (Pl.'s Br. 16-26).  In so arguing, Plaintiff identifies three purported errors by the ALJ.  According to Plaintiff: (1) the ALJ should have relied more heavily on the opinions of Dr. Giamporcaro, Ms. Albiez, and Dr. Seifer with regard to Plaintiff's RFC; (2) the ALJ relied too heavily on state agency opinion; and (3) the ALJ discounted opinion evidence on the basis of the ALJ's own lay medical opinion which was given controlling weight without affording the Plaintiff opportunity to voir dire and cross examine the opinion.  (Pl.'s Br. 18).  Those three sub-issues tend to overlap and the Court addresses them together below.

With regard to the Plaintiff's first argument, Plaintiff complains that the ALJ improperly assessed the weight to be given to Dr. Giamporcaro, Plaintiff's treating physician.  As the Third Circuit has held, "[t]reating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  Plummer, 186 F.3d at 429.

Dr. Giamporcaro opined that Plaintiff remained disabled from February 2013 to February 2014 due to coronary artery disease, diabetes mellitus, and herniated lumbar disc.  As set forth by

the ALJ, "In April 2014, Dr. Giamporcaro assessed that the claimant was unable to sit, stand or walk two hours in an eight-hour day, or lift/carry greater than 10 pounds.  He opined that the claimant would be absent from work more than three times monthly and could not deal with work stress."  (AR 15-16).  In evaluating these findings, the ALJ afforded "little weight" to them because "they [were] unsupported by diagnostic testings, findings on physical examinations, which are minimal, the claimant's ability to perform activities of daily living as reported and testified to at the hearing, and the claimant's conservative course of care, which has included limited treatment and physical therapy."  (Id. at 16).

Plaintiff contends that it was error to determine that the findings on physical examinations "are minimal."  The Court is not convinced that this amounts to an impermissible medical opinion.  As Defendant properly points out, the regulations charge the ALJ with the duty to evaluate medical opinions.  20 C.F.R. §§ 404.1527, 416.927.  Findings by Plaintiff on physical examinations have often revealed that Plaintiff had a normal musculoskeletal system or spine, see supra.  Moreover, Dr. Gordon, who performed a consultative examination of Plaintiff, determined that Plaintiff had no muscle weakness and was able to squat, walk on heels, walk on toes, and had no sensory loss.  (AR 348).  Such finding is contradictory to the findings of Dr.

Giamporcaro.  The Court does not find the terming of these
medical evaluations by others as "minimal" to amount to an
impermissible medical opinion on the part of the ALJ, so much as
an evaluation of the record's consistency.  The ALJ clearly set
forth the reasoning behind affording the opinion of Dr.
Giamporcaro little weight.  See generally Kanakis v. Comm'r of
Soc. Sec., 649 F. App'x 288, 291 (3d Cir. 2016) ("The ALJ fully
considered the opinions of [the treating physicians], and
adequately explained why they are entitled to little weight").
As such, the ALJ's handling of the medical opinion of Dr.
Giamporcaro in this regard does not amount to error.  See
generally Kerdman v. Comm'r of Soc. Sec., 607 F. App'x 141, 144
(3d Cir. 2015) (noting that "the extreme degree of limitation
assessed by [treating physician] was inconsistent with the
substantial medical evidence of the record.  [A] consultative
examiner and a board certified internist[] examined [the
plaintiff] and rendered an opinion inconsistent with [the
treating physicians.]").[4]

      With regard to Plaintiff's second contention as to Dr.
Giamporcaro's medical opinion, that the ALJ erred by discounting
it for being illegible, the Court does not agree with Plaintiff.

---

[4] The Court does take note of the fact that Kanakis and Kerdman
were not dispositions of the full Third Circuit, however, the
Court does find the reasoning set forth in those cases' analyses
to be persuasive.

As an initial matter, the Court does not find that the ALJ even discounted the opinion for this reason, so much as "noted" that they were illegible.  (AR 16).

Moreover, to the extent the ALJ did in fact diminish the weight given to the opinion due to the legibility of the treatment notes from Dr. Giamporcaro, the Court does not find this would amount to error.  As recently noted by a court in this District, even in the context of illegible notes, "the burden of proving [his or] her disability ultimately remains on [the plaintiff]."  Swanson v. Comm'r of Soc. Sec., 1:15-cv-08894-NLH, 2017 WL 825199, at *6 (D.N.J. Mar. 2, 2017).  In Swanson, where a plaintiff had not shown prejudice in refusing to consider portions of illegible notes, remand was improper.  Id.  The same is true in this case.  Plaintiff has not demonstrated prejudice in the failure to consider certain illegible portions of Dr. Giamporcaro's medical records.  Indeed, this is clear where the reason that the ALJ gave little weight to Dr. Giamporcaro's assessment was because it was inconsistent with Plaintiff's treatment history, with his physical assessments taken by others, and with his own testimony and recollection of his activities.  (AR 16; see also id. 42 (testifying that he goes to see Dr. Giamporcaro twice a month for blood work on his cholesterol and Hepatitis C).  Even if the illegible portions of Dr. Giamporcaro's treatment notes were 100% consistent with his

legible opinion as to Plaintiff's abilities, that opinion would still remain at odds with Plaintiff's own treatment history, abilities as assessed by other examiners of Plaintiff, and testimony and adult function report, which is the very ground upon which the ALJ afforded the opinion little weight.  (See AR 50 (testifying that he attends classes each day from 9:00 to 4:00); id. at 41 (testifying that he spends time with his grandkids until they "wear him out"); id. (testifying that he "might cook [his family] dinner" when they come over); id. 239-46 (Adult Function Report concerning Plaintiff's limitations and abilities)).  On that record, the Court cannot determine that the Plaintiff is prejudiced by the inability of the ALJ to decipher portions of Dr. Giamporcaro's notes and that the determination was based on substantial evidence.[5]  On this ground, as well, the ALJ did not err in assessing Dr. Giamporcaro's testimony.

Plaintiff also contends that the ALJ improperly granted little weight to the assessment of Ms. Albiez.  The ALJ noted that:

---

[5] The Court is also mindful of Grabowski v. Astrue, in which another court in this District determined that remand was not appropriate on the ground that certain treatment notes were illegible.  "In this case . . . the evidence was adequate to determine that Plaintiff was not disabled, regardless of whether some of Dr. Gandhi's notes were illegible.  Moreover, [the] Court notes that Plaintiff shoulders the ultimate responsibility to provide evidence that supports his claim."  Civ. A. No. 09-6218 (JAP), 2011 WL 867547, at *6 (D.N.J. Mar. 10, 2011).

> [l]ittle weight is given to this opinion, primarily
> because the assessment made by Ms. Albiez is not
> consistent with her reported findings on mental status
> examinations throughout treatment. Few clinical signs
> were noted in her report, and as such, her assessment of
> moderate to marked limitations is inconsistent. Also,
> at the hearing, the claimant reported that he remains
> able to engage in a wide range of daily activities, which
> further contradicts the significant limitations assessed
> by Ms. Albiez.

(AR 17). Ms. Albiez's assessment of Plaintiff found him to be

markedly or moderately limited in all categories related to

understanding and memory, as well as sustained concentration and

persistence. (AR 847-48).

As an initial matter, Defendant contends – and Plaintiff dos

not refute – that Ms. Albiez's opinion is not a proper medical

source to be considered. Although Plaintiff refers to Ms. Albiez

as "Dr. Albiez" in his brief at various times, (Pl.'s Br. at 22),

the record is clear that she is not a doctor but a nurse

practitioner. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362

(3d Cir. 2011) (indicating that ALJ "was not required to consider

[nurse practitioner's] opinion at all because, as a nurse

practitioner, she is not an 'acceptable medical source[].'").

Accordingly, the Court is mindful that the ALJ did not need to

treat Ms. Albiez's treatment notes as a medical source.

That noted, the Court finds no error in the assessment of

Ms. Albiez's opinion as to Plaintiff. Although Plaintiff was

assessed to be moderately or markedly limited in areas related to

concentration and memory by Ms. Albiez, on December 5, 2013 – a few months before this evaluation, Ms. Albiez reported that Plaintiff had a current GAF score of 55,[6] with a highest GAF in the past year of 60 – findings that are inconsistent with Plaintiff's extreme limitations as assessed only a month prior. In that same assessment, Ms. Albiez noted that Plaintiff had no "difficulty thinking or concentrating."  Ms. Albiez similarly did not identify Plaintiff as having a poor memory.  (AR 850).  On these inconsistencies, and others which were referenced by the ALJ, the decision to afford little weight is based on substantial evidence and the Court does not find that the ALJ substituted his own medical opinion.[7]

---

[6] As has been frequently noted, the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, DSM–5, abandoned the GAF scale as a measurement tool.  Accordingly, the Social Security Administration now permits ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental disorders.  But, ALJs have been instructed that a "GAF score is never dispositive of impairment severity," and an ALJ should not "give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence." SSA AM–13066 at 5 (July 13, 2013).

[7] Plaintiff seeks remand due to the fact that the ALJ relied upon Plaintiff's testimony that he could still perform a wide-range of daily activities in discounting Ms. Albiez's opinion.  Plaintiff contends that no reading of Plaintiff's testimony could support such a finding.  (Pl.'s Br. 24-26).  While the Court does find that Plaintiff testified to some daily activities he could still perform such as cooking and spending time with his grandchildren, (AR 41, 54), the Court additionally finds that Plaintiff's adult function report, (AR 236-43), which the ALJ determined to attest to a wide range of daily activities in other portions of his analysis of the RFC, (AR 16 ("the claimant's ability to perform

### i. <u>Consideration of Other Opinions</u>

The ALJ also reasonably relied on the opinions by the state agency psychologists and physicians.  ALJs are required to consider state agency physician assessments as opinion evidence. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).  This is because, as Defendant notes, these "are highly qualified physicians . . . and experts in Social Security disability evaluation."  <u>See</u> <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2012) (under the Commissioner's regulations, opinions of non-examining state agency physicians "merit significant consideration" in the RFC assessment); <u>Jones v. Sullivan</u>, 954 F.2d 125, 129 (3d Cir. 1991) (holding that an ALJ may rely on the opinion of a non-examining medical source, even when it contradicts the opinion of a treating physician, when it is consistent with the record).  Simply put, the fact that the ALJ weighed the state agency consultants better than the treating physicians in the end is not dispositive provided that it was done with adequate reasoning.  The Court does not agree with Plaintiff that these state agency findings were "mined for their benign findings while the limitations are systematically

---

activities of daily living as reported and testified to at the hearing")), shows the full range of activities Plaintiff indicated he was able to perform.

excluded." (Pl.'s Br. 19). The record contains adequate evidence to arrive at an RFC determination.

Likewise, Plaintiff's argument that the ALJ erred by substituting his own opinion for that of Dr. Seifer also misses the mark. (Pl.'s Br. 21). For the same reasons Ms. Albiez's opinion was not afforded greater weight – it was inconsistent with the record as a whole – the ALJ determined that Dr. Seifer's GAF assessment of Plaintiff was only afforded some weight because of the nature of GAF scores and the consistency of that GAF score with the rest of the record.

As the ALJ made clear and as Plaintiff concedes, GAF scores "are of limited utility," although they are not insignificant. The ALJ found that the nature of GAF scores, which are "a GLOBAL assessment, paints a rather broad picture that is somewhat less definitive with respect to particular aspects of workplace functions, for example, and that is, furthermore, subject to greater variability day to day and practitioner to practitioner." (AR 17). This discussion of GAF scores is consistent not only with Plaintiff's understanding of GAF scores, (Pl.'s Br. 21), it is also consistent with regulations and court treatment on the topic. See supra; see also Hughes v. Comm'r Soc. Sec., 643 F. App'x 116, 119 (3d Cir. 2016).

Moreover, the ALJ also discounted the assessment of Plaintiff because of inconsistencies with the record as a whole,

including inconsistencies with examinations by others and with Plaintiff's description of his activities. It is not for this Court to determine if it disagrees with the ALJ's ultimate outcome. Rather, it is for this Court to determine whether the ALJ's reasoning was based on substantial evidence. Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") Here, the Court finds that the ALJ's RFC analysis was supported by substantial evidence.

**B. Step Five Analysis**

Plaintiff's second contention on appeal is that the ALJ did not adequately support his Step Five finding that significant jobs in the national economy were available to Plaintiff. As Plaintiff correctly points out, "Questions posed to the Vocational Expert must accurately portray the Plaintiff's individual physical and mental limitations" in order to consider the VE's testimony as valid concerning a Plaintiff's ability to perform other employment. Schonewolf v. Callahan, 972 F. Supp. 277, 289 (D.N.J. 1997) (internal quotation marks omitted). A hypothetical question is not complete if it does not properly analyze a Plaintiff's impairment and his possible functional limitations.

Plaintiff specifically contends that a switch in the questions posed to the VE demonstrates a problem with the ultimate determination that Plaintiff could get jobs in the national economy. As he notes, "It is not at all clear that the jobs provided by the Vocational Expert via interrogatory are actually consistent with a worker being limited to simple routine tasks and simple work decision[s]. The positions listed are SVP 2 positions, which by definition [are] something more than simple instruction. An SVP 1 job is defined as one requiring a 'short demonstration only', while an SVP 2 job is defined as one requiring anything beyond short demonstration up to and including 1 month." (Pl.'s Br. at 29). As Defendant notes, courts have rejected this precise argument. Thrash v. Astrue, No. 09-1304, 2010 WL 3775063, at *12 (D. Ariz. Sep. 21, 2010) (finding no conflict between the VE's testimony and the DOT regarding the identification of jobs having an SVP of 2 and the limitation to simple work). This is because the SVP and the reasoning level of a job are two different considerations:

> A job's SVP is focused on "the amount of lapsed time" it takes for a typical worker to learn the job's duties. A job's reasoning level, by contrast, gauges the minimal ability a worker needs to complete the job's tasks themselves . . . . "SVP ratings speak to the issue of the level of vocational preparation necessary to perform the job, not directly to the issue of a job's simplicity, which appears to be more squarely addressed by the GED [reasoning level] ratings."

Id. (quoting Meissl v. Barnhart, 403 F.Supp.2d 981, 983 (C.D. Cal. 2005) (internal citation omitted)).  Tellingly, despite Defendant's clear reliance on it, Plaintiff does not cite or try to distinguish this on-point case in his reply brief.

Plaintiff also argues that the jobs proffered by the VE, such as a photocopying-machine operator are not simple at all. (Id.)  Plaintiff cites only the descriptions of the job and his own belief that "these tasks are more than simple, routine tasks that only require simple work decision."  (Id. at 30).  This unsupported assertion is plainly contrary to the VE testimony on the point, upon which the ALJ relied, and is not underscored by any citation to case law by Plaintiff.  Simply put, the ALJ is entitled to rely upon VE testimony as substantial evidence at Step Five.  Flynn v. Colvin, 2014 WL 3827849, at *6 (D.N.J. Aug. 4, 2014) (citing Rutherford v. Barnhard, 399 F.3d 546, 555 (3d Cir. 2005) (explaining that the ALJ is entitled to rely upon VE testimony as substantial evidence for step-five determination)).

The Court is unpersuaded by Plaintiff's unsubstantiated opinion that the Commission has failed to meet its Step Five Burden.  Accordingly, the Court finds no error.

## V.    CONCLUSION

For the reasons set forth above, the determination of the Commissioner is affirmed.  An Order follows.

DATED: <u>June 26, 2017</u>


                              <u>s/Renée Marie Bumb</u>
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE